P. Rielly Son, a corporation, voluntarily dissolved, and thereafter the Fidelity-Union Trust Company was appointed receiver. To the receiver's final account stockholders and creditors filed exceptions.
The company, and its owners before its incorporation, were engaged in the leather manufacturing business in Newark for many years, and prospered. It carried on too long after the leather business declined, with the usual result. Its plant, which was large, was perhaps as old as its business and as decayed. Shortly after the receiver was appointed there came a pronounced slump in the market for factories, especially leather factories; there was no market. The receiver sold the personalty, collected the debts and held on to the plant awaiting a demand for that class of property. A revival began in 1923 and the plant was sold at public auction, with the court's approval. The plant had been appraised at $174,500. In the interval a part had been sold for $6,250. The remainder brought $60,600. There was a mortgage on the property for $45,000.
By one of the exceptions it is sought to charge the receiver with $107,650, the difference between the appraisal and the sum realized, and by another exception to charge it with $74,437.34, expended by the receiver in upkeep, for interest on the mortgage, taxes, insurance premiums, c., during the three years and eight months which elapsed between the receiver's appointment and the consummation of the sale. The complaint now is that the receiver's duty was to sell the real estate, reasonably forthwith; and corollarily, that the outlay for maintenance during the delay was wasteful. But there was no market for or opportunity to dispose of it. Prominent real estate dealers in Newark had the property in hand but to no avail, and to have offered it for sale at public auction would have been abortive. That there was no market is established, and it is not understood that it is questioned. That being so, the exceptants argue, in effect, that the receiver should have got rid of the plant, abandon it if necessary, to save the cost of upkeep. In retrospection and result, *Page 434 
the contention is plausible, but not in the then prospective, during the receiver's administration. The sum of the appraisal alone would forbid a hasty sale or an abandonment. However, had either course been taken, as it now is insisted it should have been, the cry would be that the property had been sacrificed, and with emphasis, if it had again come into its own. Though there was at no time an imminent prospect of sale, the receiver was justifiably hopeful that eventually it would come to pass, and profitably, and, in the dilemma, the only reasonable method of protecting the estate was pursued, and, although it resulted in disappointment, the receiver is to be commended, not condemned. It would not let go, and in holding on it necessarily had to make the expenditures. A receiver's duty is to exercise ordinary care and prudence and to deal as faithfully with the assets as he would with his own. More than that is not demanded by law. The same misfortunes, under similar perplexing circumstances, are not infrequent in attempting to conserve individual holdings. Only recently a large leather concern in Newark was declared insolvent by this court in which the owner-stockholders had the same experience as the receiver, and lost their private fortunes in a futile effort to save their plant.
Another exception seeks in the alternative, to charge the receiver with some fifteen hundred dollars, a constituent sum of the items embraced in the last mentioned exception, paid for interest penalties and costs on accrued and current taxes, imposed because they were not paid timely. It is claimed that the receiver was in funds sufficient to pay the taxes and avoid the fines. An analysis of the account would indicate that the receiver had sufficient cash at times to meet the charges, but it also appears that there were, constantly, other and more pressing demands, pending and impending, for interest, insurance, watchman and upkeep, and that it would have been imprudent not to have provided for them, even at the expense of the fines. The hazard of a receivership insolvency was lessened by this course.
By another exception, also in the alternative, the receiver is sought to be charged with $13,876.73, also a constituent part of the exception just referred to, spent for taxes, interest *Page 435 
on mortgage and upkeep between July 10th, 1923, the date of the sale of the plant, and July 24th, 1924, the time it was consummated. The sale was confirmed by the court August 6th, 1923. The receiver had sold the property free and clear of all encumbrances. The purchaser applied to the Fidelity-Union Trust Company for a title policy of insurance, and, the title being searched, imperfections were discovered, among others, that the city of Newark had an old paper street easement, by map dedication, over a part of the property. All the objections to the title, and they were numerous, were removed by December 21st, except as to the potential street, and it was so reported to the purchaser on that day. He refused to take subject to that cloud. Thereupon, early in January, the receiver petitioned the city for a vacation. The city counsel took under advisement the question as to whether there should be a vacation or a release and surrender, depending upon whether the dedication had, in fact, been completed by acceptance or was merely inchoate, and, apparently, being unable to determine the exact status, eventually advised both courses, and promptly thereupon two petitions, one for vacation, the other for a release, were filed in May and on June 17th the city commission passed the ordinance effective the following July 19th, 1924. The complaint is that the receiver was remiss in its duty in not informing itself of the defect in the title before it made the sale, and, further, was dilatory, after discovering the encumbrance, in having it removed. The latter ground finds no support in the proofs. Immediately upon the purchaser refusing to take, counsel took the necessary steps. Up until that time there was no assurance that the purchaser would not take title subject to the outstanding interest, nor that a title company would not insure without a reservation as to the blemish. When the city commission finally concluded to act, it proceeded with the customary regularity. That the city authorities failed or refused to be hastened into the surrender of a public right or interest cannot in fairness be charged to the receiver. There was no delay on the receiver's part thereafter in bringing the sale to a completion. The thing, however, more earnestly pressed is that the receiver should have *Page 436 
searched the title aforehand and cleared it of all objection before offering it for sale. That would have been advisable, as we now view the consequences, but the omission was not a failure of duty. The property had been in the possession of the Riellys for upwards of forty years, and it was not unreasonable for the receiver to assume that the ownership was in the corporation subject to the known mortgage and tax lien encumbrances. It was free and clear of these, and such that the property was intended to be offered for sale, and that they should be liquidated out of the proceeds. The dedication had been by a map filed in 1836, laying out the surrounding property long before the Riellys acquired ownership and the city's right, if it has any, was obscure and a recovery remote. In such circumstances it would have been decidedly unusual, to say the least, for the receiver to wipe the title spotless. Ordinary care and precaution would not prompt it and the exactions of a title company, which never takes a chance, that every blemish be removed before it issued a title policy, is not a test of ordinary prudence. The receiver could well reason that the title and possession of the Riellys having been undisturbed for nearly a half a century the purchaser would be content. The measure of duty which the exceptants invoke is extraordinary, to which the receiver is not called upon to respond. It is also pointed out that in the proceeding leading to the auction sale there was a misdescription of the lands, but this was cured by order and caused no delay in perfecting the title.
The last exception to be considered is to charge the receiver with the loss by fire of a barrel or two of inflammable acid. The exceptants say the value was $678.40; the receiver, $147.70. It was uninsured by the company and the receiver's failure to insure is the ground of the charge. The company carried heavy and full insurance covering all its property. Amongst others it had a thousand dollars "yard" insurance. The acid was not in the yard proper but was kept across the street in a shack. Whether the company regarded the acid as covered by the yard insurance, or that the premium on such risk was so high as to not warrant insurance is not clear. The receiver took over all the property, insured, as it was, *Page 437 
assuming, as it would seem, that it was within the yard insurance, but neither is that clear. A receiver, of course, is obliged to keep property insured against fire, and failure brings personal responsibility, but if the company in its carefulness for full insurance purposely refrained from insuring the item or rested in the belief that it was covered by the yard insurance, it is difficult to see how the receiver can be charged with neglect if he followed the owner's policy or was, as the owner was, of the belief as to the coverage. It is stated that the annual premium for insurance of this character of property was about twenty-five per cent., and possibly that deterred the company from effecting insurance, and instead removed the hazard across the way from the plant. The receiver might have been adversely criticized if it had made such an outlay.
The exceptions are overruled.
The receiver will be allowed $5,000; counsel fees will be allowed upon notice and proof of the services rendered.